IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTOPHER NEWKIRK, on his own behalf and on behalf of a class of those similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 1:21-cv-465 |
| TOWN OF KNIGHTSTOWN, INDIANA, ) ) | COMPLAINT – CLASS ACTION |
| Defendant. ) | |

**VERIFIED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

**Introductory Statement**

1. The Town of Knightstown ("the Town") operates a Facebook page on behalf of the Knightstown Police Department ("the Police Department"). On this Facebook page, it regularly "posts" information about the activities of the Police Department and about the Knightstown community, and it allows Facebook users to "comment" on these "posts." However, it has adopted a practice or policy of "banning" Facebook users—and thereby not only removing their previous "comments" but also prohibiting them from using the "comment" function in the future—when those users express opinions or provide information that is deemed to reflect poorly on the Town or its Police Department. Christopher Newkirk, the former Chief of the Police Department, is one of at least twenty-six persons who have been "banned" pursuant to this practice or policy for making "comments" that did not flatter the Police Department. The Town's actions are unconstitutional as constituting viewpoint-based discrimination in violation of the First Amendment, and appropriate declaratory and injunctive relief must issue.

1

**Jurisdiction, Venue, and Cause of Action**

2. The Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

4. Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

5. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

**Parties**

6. Christopher Newkirk is an adult resident of the Town of Knightstown, Indiana.

7. The Town of Knightstown, Indiana is a municipality located in Henry County, Indiana.

**Class Action Allegations**

8. This action is brought by Mr. Newkirk on his own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

9. The class is defined as follows:

    all persons currently banned, or who will in the future be banned, from commenting on the Facebook page of the Knightstown Police Department.

10. All the requirements of Rule 23(a) are met in this cause in that:

    a. The class is so numerous that joinder of all members is impractical. A public-records request submitted to the Town of Knightstown by Mr. Newkirk has revealed that, between July 2020 and January 2021, twenty-six persons were banned from commenting on the Facebook page of the Knightstown Police Department. This number will, of course, continue to grow.

    b. There are questions of law or fact common to the class: whether the practice or policy of the Town of Knightstown of banning persons from commenting on the Facebook page of the Knightstown Police Department based on the viewpoints they express violates the First Amendment.

    c. The claims of the representative party are typical of those of the class.

   d. The representative party will fairly and adequately protect the interests of the class.

11. The further requirements of Rule 23(b)(2) are met in this cause as at all times the defendant has acted or refused to act in a manner generally applicable to the class, thereby making final injunctive and declaratory relief appropriate with respect to the class as a whole.

12. Undersigned counsel is an appropriate person to be appointed as counsel for the class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure and should be so appointed.

**Factual Allegations**

13. Christopher Newkirk is an adult resident of the Town of Knightstown ("Town") in Henry County, Indiana.

14. Among other things, the Town operates the Knightstown Police Department ("the Police Department"). Mr. Newkirk previously served as Chief of the Police Department until he resigned from that position in July 2020.

15. The Police Department, like many government officials and entities, maintains and operates a Facebook account. The Police Department's Facebook page is available at https://www.facebook.com/knightstownpolice.

16. On its Facebook page, the Police Department—among other things—posts announcements concerning the activities of the Police Department and its officers, as well as other information of relevance to the Knightstown community. Photographs or other images often accompany the Police Department's Facebook "posts."

17. The Police Department's Facebook page can be viewed by the public and anyone with a Facebook account can post a comment in response to the Police Department's posts or in response to other user comments that have been made on those posts.

18. When Mr. Newkirk served as the Chief of the Police Department, he frequently used this

"comment" function to respond directly to questions, concerns, or other comments voiced by members of the Knightstown community. Even after leaving the Police Department, he remains involved in the community and interested in issues of relevance to the Knightstown community. He therefore frequently views any Facebook posts made by the Police Department and, in the past, has used the "comment" function to respond—either directly to these posts or to other persons who have "commented" on these posts—and to provide information that he believed to be relevant to the conversation or to otherwise provide his thoughts on the subject-matter.

19. On October 7, 2020, the Police Department made a "post" to its Facebook page in which it informed persons that its police vehicles would be "getting new decals" and in which it provided a photograph of a vehicle with the new decals:



4

20. One Facebook user commented on this "post" by questioning whether the financial expenditures for new decals represented the best use of the Town's resources:

    Looks good, but couldn't the money it cost be more beneficial for our town in other ways like more patrolling?

21. Mr. Newkirk then used the "comment" function of Facebook to respond directly to this user's concerns by stating as follows:



Newkirk D Chris
Ellis Bechtold the old graphics were under warranty and an appointment was made prior to my leaving to have them replaced for FREE. The police committee was aware of this. It should have went back to be redone for free under warranty. This is exactly why I am running for office. I live in Knightstown so I care where my money goes.

1m  Like  Reply

22. This information was true: Mr. Newkirk was aware from his time as Chief of the Police Department that the decals were under warranty and could have been replaced by the company who had done the original decals without any cost to the taxpayers.

23. The Police Department used the "comment" function to respond directly to Mr. Newkirk in order to indicate that they had tried reaching out to the company that provided the original decals but had not received a response.

24. Mr. Newkirk then used the "comment" function to state as follows:

    I've bought 400 yard signs from him in the last 3 months. Never ever had an Issue reaching him. He even responds to Facebook messages and his address is listed. Just so everyone knows the company did and always does a great job. The graphics were pealing due to a manufactures defect In a roll of vinyl. Mikel Knepley does excellent work and I've never had an issue with his company.

5

In making this "comment," Mr. Newkirk "tagged" Mikel Knepley, the owner of the company that provided the original decals. By "tagging" Mr. Knepley, he ensured that Facebook would notify Mr. Knepley that he had been mentioned in a conversation and ensured that Mr. Knepley would see the Police Department's statement that they had unsuccessfully attempted to reach out to him.

25. After he was "tagged" by Mr. Newkirk, the owner of the company that provided the original decals used the "comment" function to directly undermine the Police Department's statement that it had attempted to reach out to him to have the decals replaced for free:



26. Mr. Newkirk responded to this "comment" by stating that he had had "nothing but great experiences using [Mr. Knepley's] company" and by stating further that "[a]s for the lying it's topical [*sic*] Knightstown politics."

6

27. Although Mr. Newkirk's "comments" were critical of the Town and the Police Department, they were not threatening, obscene, profane or otherwise improper.

28. Following and as a direct result of this conversation, the Police Department promptly "banned" Mr. Newkirk from its Facebook page. A Facebook user who is "banned" from the Facebook page of a public entity is able to visit the entity's Facebook page and to view any "posts" or "comments" on the page but is not able to post his own "comments" in response to the entity's "posts" or in response to any "comments" made in response to the "posts." Therefore, by banning Mr. Newkirk the Police Department prohibited him from engaging in any expressive activity on the Police Department's Facebook page.

29. When a user is "banned" from the Facebook page of a public entity, not only is he prohibited from making any new "comments" on that Facebook page, but any previous "comments" that he made on the Facebook page, regardless of their content, are also automatically removed and are no longer visible to persons visiting the Facebook page.

30. The Town maintains a practice or policy of "banning" persons from the Facebook page of the Police Department when those persons post "comments" that reflect poorly on the Town or the Police Department while allowing persons who post favorable "comments" to continue engaging in expressive activity. No definite and articulable standards exist to guide the Town in determining which Facebook users will be "banned" and which Facebook users will not be "banned." In other words, the Town engages in standardless viewpoint discrimination in determining which users to "ban" from commenting on the Facebook page of the Police Department.

31. After he was "banned" from the Facebook page of the Police Department, Mr. Newkirk submitted a formal public-records request to the Town in which he sought records

concerning the number of persons who had been "banned" from the Police Department's Facebook page as well as the "comments" posted by these persons that resulted in them being "banned" from this page.

32. In response to Mr. Newkirk's public-records request, the Town provided, *inter alia*, a document indicating that, as of December 22, 2020, twenty-six Facebook users had been "banned" from commenting on the Facebook page of the Police Department. A true and correct copy of this document is attached and incorporated herein as Exhibit 1.

33. At the time that Mr. Newkirk resigned from the Police Department in July 2020, none of the twenty-six Facebook users who were banned from commenting on the Facebook page of the Police Department as of December 22, 2020 had been "banned" from the Facebook page.

34. In addition to being provided a list of the "banned" Facebook users in response to his public-records request, Mr. Newkirk was also provided copies of the "comments" made by "banned" users to the Facebook page of the Police Department. Although it is impossible to determine from the documents that Mr. Newkirk was provided which precise "comments" led to the "banning" of each Facebook user, many of these users posted comments that were critical of the Police Department or that expressed favorable opinions about Mr. Newkirk's tenure as Chief of the Police Department. At the same time, many of these users also posted "comments" that were generally supportive of the Police Department or its officers. Even these "comments," however, were removed from the Facebook page of the Police Department once the user was "banned."

35. In addition to "banning" a Facebook user entirely, a public entity that operates a Facebook page may choose to "delete" individual "comments." This action serves to remove a

specific "comment" that the entity finds objectionable but does not prohibit the Facebook user who made the "comment" from engaging in future expressive activity on the page.

36. In his public-records request, Mr. Newkirk also sought information concerning individual "comments" on the Police Department's Facebook page that had been "deleted" by the Police Department. He did not receive a response to this portion of his inquiry, and he is unaware as to whether (or how many) individual "comments" have been "deleted" by the Police Department even though the Facebook user who made those "comments" was not "banned" entirely.

37. Mr. Newkirk remains extremely involved in his community and concerned about the operations of the Town and its Police Department. He would like to be able to once again "comment" on "posts" made to the Facebook page of the Police Department, and would also like his previous "comments" to be restored so that Facebook users may view these "comments."

38. Additionally, while Mr. Newkirk is able to view the Police Department's Facebook page and any "comments" made on that page from Facebook users who have not been "banned," he believes strongly in full and open debate on public issues and would like to be able to view "comments" previously made by "banned" users that have been removed from the Police Department's Facebook page by virtue of the users being "banned." His inability to view these "comments" impinges on his right, cognizable under the First Amendment, to receive information.

39. At all times the defendant has acted under color of state law.

40. As a result of the actions or inactions of the defendant, the plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

**Legal Claim**

41.  The Town's action in "banning" users from "commenting" on the Facebook page of its Police Department due to the viewpoints that they express, and without definite and articulable standards, violates the First Amendment to the United States Constitution.

**Request for Relief**

   **WHEREFORE,** the plaintiff requests that this Court do the following:

1.  Accept jurisdictions of this cause and set it for hearing at the earliest opportunity.

2.  Declare that the defendant has violated the rights of the plaintiff for the reason(s) described above.

3.  Issue a preliminary injunction, later to be made permanent, enjoining the defendant (a) to remove the "bans" from "commenting" on the Facebook page of the Knightstown Police Department that it has imposed on the plaintiff and on other Facebook users and (b) from "banning" Facebook users in the future based on the viewpoints that they express.

4.  Award the plaintiff his costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5.  Award all other proper relief.

                          Gavin M. Rose
                          ACLU of Indiana
                          1031 E. Washington St
                          Indianapolis, IN 46202
                          317/635-4059
                          fax: 317/635-4105
                          grose@aclu-in.org

                          *Attorney for the plaintiff and the putative class*

## **VERIFICATION**

      I hereby verify, under penalties for perjury, that the foregoing factual statements are true and correct to the best of my information and belief.

02-26-2021                                        *Christopher D. Newkirk*
Date                                              Christopher Newkirk, Plaintiff